S. LANE TUCKER
United States Attorney

EMILY ALLEN
KELLY CAVANAUGH
RYAN TANSEY
Assistant United States Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Email: emily.allen@usdoj.gov

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | |
| vs. | Case No. 3:21-cr-00094-TMB |
| ANGELA LINCOLN, | |
| Defendant. | |

**SENTENCING MEMORANDUM**

The United States recommends imposition of the following sentence:

INCARCERATION ................................................................................. 24 MONTHS
SUPERVISED RELEASE ............................................................................. 3 YEARS
SPECIAL ASSESSMENT ................................................................................... $200
RESTITUTION ................................................................................................ NONE
FINE ................................................................................................................ NONE

## STATEMENT OF FACTS

### A. Lincoln's Smuggling Venture with Goose Creek Inmates

Angela Lincoln was a long-serving and well-regarded prison guard at Goose Creek Correctional Center in Wasilla, Alaska. In 2019, she allowed greed to overcome her ethical responsibilities. Over the course of about a year, she pocketed $30,000 in bribe payments in exchange for smuggling illegal narcotics and other contraband into the facility she was sworn to secure and protect. She sneaked in drugs and cell phones for the inmates inside Goose Creek, knowing, of course, that this was contrary to the well-being and health of the other inmates, dangerous to her own coworkers, and a disservice to the people of Alaska who depend on Goose Creek's correctional services to both punish and rehabilitate offenders. Lincoln did this not because she was scared or coerced, but for much simpler reasons: it boosted her income, her ego, and her regard among the influential inmates who became her co-conspirators.

Once confronted with the evidence of her crime, Lincoln became contrite, and has admitted all of her own actions that form the basis of this prosecution. As she has acknowledged, by mid-2019 she had entered into an agreement with "Inmate 1" to smuggle cell phones and Suboxone strips into Goose Creek, in exchange for cash payments. Inmate 1 was serving a 100-year sentence for two counts of first-degree murder, and he had built himself a network of followers and "grinders" both inside the prison and out of custody across the country. He was essentially running a business, with "employees" who procured his supply, distributed it around the prison, and collected payment from the family and friends of inmates on the outside of the prison walls. He had mechanisms to keep his

2

business undetected, laundering funds through his network of financial "staff" and hiding his activity behind a religious group and "commissary" payments.

Lincoln started by bringing him a contraband cell phone, smuggling it into the secure facility by virtue of her position as a Goose Creek guard. Her involvement soon grew to bringing in Suboxone strips, hidden inside of seemingly benign objects like books, bottles, or candy wrappers. There could be no mistaking the illicit nature of these packages; Lincoln had them delivered to her home by a co-conspirator who "dead-dropped" them, in the cover of night, to an area on her property where Lincoln could retrieve them without arousing suspicion.

Once the contraband was inside the prison, Inmate 1 put his distribution network to work at Goose Creek. The "strips," as Suboxone was known, sold for vastly more money inside Goose Creek than outside the prison walls, and Inmate 1 made tens of thousands of dollars in profits. He shared it with his distributors and his team of "grinders"—essentially, money launderers—who helped with the complicated web of finances. He also shared a large portion of it with Lincoln. Lincoln would anticipate a payday in exchange for delivering Inmate 1's goods inside the prison. As for the grinders, Inmate 1 and his co-conspirators would coach them, in the event they were questioned about the money, to falsely claim that it was financial help for their incarcerated friends or family members, intended to pay for religious events or give money for their commissary accounts.

Inmate 1 employed one primary money laundering expert to consolidate all the proceeds and deliver Lincoln's share. At first, this was "T.W.," who Inmate 1 described as his sister. T.W. was located out of state, and she mailed or transferred money to Lincoln

3

from her home in Oregon. T.W. paid Lincoln around $20,000 in bribes, all of which were designed to influence and reward Lincoln's official acts in bringing drugs and phones into Goose Creek. T.W. left this role in early 2020, and Inmate 1 found a new expert, "Lisa," to help launder the proceeds of his drug sale. "Lisa" mailed Lincoln several more packages of cash, totaling another $10,000.

Unbeknownst to Inmate 1 or Lincoln, however, Lisa was working with federal agents, and she monitored their conversations and recorded their calls. On instructions from Inmate 1, Lisa mailed $1,000 cash to Lincoln's home on March 25, 2020, another $1,000 cash on April 6, 2020, and $2,000 cash on May 6, 2020. She included greeting cards, notes, and trinkets like a small change purse, to help alleviate Lincoln's concern that her family might ask questions about piles of unexplained cash arriving by mail from strangers. Lincoln even suggested to Lisa that once she could establish that they were "friends," she'd face less questions and scrutiny from her family.

Lincoln began texting with Lisa in May 2020. Inmate 1 gave Lincoln the number to reach Lisa, so that they could coordinate directly about shipments and evade Lincoln's family's scrutiny. Lincoln was delighted to receive Lisa's packages—stuffed with hidden money—and made that clear with warm, lighthearted text messages. She displayed no sign of hesitation or reluctance. She gave no indication that she had any fear of Inmate 1, or that she was acting under any kind of pressure. She filled her correspondence with enthusiastic exclamation points and bright emojis. It is clear from their exchange, set forth below, that Lincoln was eagerly participating as a key player in the conspiracy:

| Date | Time | From | Text received | Text sent | From |
|---|---|---|---|---|---|
| 5/21/2020 | 20:06:23 UTC | Lincoln | Hello this is Angela. Hope your doing well today!! Nice to meet you. Thank you for everything!! This is my number. He said you would like to keep in touch. Great idea. Just shoot me a txt when I go to PO and I will shoot u a txt when I receive it. ?=?[1] | | |
| 5/22/2020 | 18:37:22 UTC | Lincoln | Hello just making sure you got my text and this is Lisa. *winking emoji* | | |
| 5/22/2020 | 20:53:03 UTC | Lincoln | Hey Lisa its Ang. Hope all is well with ya. Thank you for everything. Your awesome. Feel free to txt anytime. Have a wonderful day!?=? | | |
| 5/22/2020 | 21:02:46 UTC | | | Hi Ang!! It's so good to hear from you! I'm sorry I didn't respond sooner, the charger for my phone wasn't working so I picked one up this morning. | Lisa |
| 5/22/2020 | 21:17:48 UTC | Lincoln | Sweet!! Its all good!!! looking forward to keeping in touch with you!! | | |
| 5/22/2020 | 23:06:09 UTC | | | me too! Thank u for the masks! Do u get the 2nd package I sent? | Lisa |
| 5/22/2020 | 23:08:26 UTC | Lincoln | Your welcome!! Any time. Yes I did!!! Thank you. And i use the little bag?=? | | |
| 5/22/2020 | 23:45:24 UTC | Lincoln | When do u think you will send another one? If there is ever anything you would like from Alaska let me know!! | | |
| 5/23/2020 | 19:49:41 UTC | Lincoln | The last package I got was the one with an owl envelope. Is that correct. | | |

---

[1] Some of the formatting of these text messages did not transfer, likely because they used special characters or emojis. This summary includes certain of those unformatted characters, or a description of the emoji when possible. In addition, this summary redacts the first name of Inmate 1.

| Date | Time | From | Text received | Text sent | From |
|---|---|---|---|---|---|
| 5/23/2020 | 22:40:32 UTC | | | that's it! I'll find out from [*Inmate 1*] about sending u another package. About how often did T.W. send you packages? | Lisa |
| 5/24/2020 | 01:46:48 UTC | Lincoln | Once a week is fine. Or every other week. What ever is easiest for you. I have it covered with my family now that your my friend and will me sending me packages. So we are good.!!! | | |
| 5/24/2020 | 21:19:37 UTC | | | hi Ang! Mailing you a nice package today | Lisa |
| 5/24/2020 | 23:00:53 UTC | Lincoln | Sweet!!! I'm excited!!!. Thank you!! *winky emoji* | | |
| 5/28/2020 | 19:48:18 UTC | | | hi Ang, I don't think I send this to you, 9405511899562630963243 | Lisa |
| 5/29/2020 | 02:36:28 UTC | Lincoln | Thank you let me check with Mom. It should have been here today. | | |
| 5/29/2020 | 02:52:50 UTC | Lincoln | Still haven't received package. It says that tracking number is not valid. Sorry it took me so long to answer I just got of work. | | |
| 5/29/2020 | 03:24:14 UTC | Lincoln | Did U send it. | | |
| 5/29/2020 | 03:24:31 UTC | Lincoln | Ups USPS or fedex | | |
| 5/29/2020 | 03:27:10 UTC | Lincoln | Ok thank you expected delivery says May 30th. 8 p.m. | | |
| 5/30/2020 | 01:57:04 UTC | | | hi Ang, give me a call when u can, checking on the gifts. L | Lisa |
| 5/30/2020 | 02:38:43 UTC | Lincoln | Hello just got off work. Mom said the gifts arrived today. So I will open it when I get home. Thank you very much. | | |
| 5/30/2020 | 02:39:55 UTC | | | good! I was starting to freakout | Lisa |

| Date | Time | From | Text received | Text sent | From |
|------|------|------|---------------|-----------|------|
| 5/30/2020 | 02:40:34 UTC | | | can u call ? Don't want to text | Lisa |
| 5/30/2020 | 02:41:26 UTC | Lincoln | I'm car pulling with another CO. Can I call when I get home. | | |
| 5/30/2020 | 02:41:53 UTC | | | yep:) | Lisa |
| 5/30/2020 | 02:42:14 UTC | Lincoln | *winky emoji* | | |
| 5/30/2020 | 03:32:49 UTC | | U can call when u have a min. | | |
| 5/30/2020 | 03:33:16 UTC | | | I'm free now | Lisa |
| 6/9/2020 | 00:48:07 UTC | | Hun I really enjoy your little gifts but don't feel like you have to put on in each package. Some free ideas are cool looking rocks or stones or bird feathers or earthy like stuff!!! Hope all your travels went well and safe!! | | |
| 6/10/2020 | 04:07:11 UTC | | | hi Ang, I'm glad you liked the package! Give me a call if u have a chance, just wanted to be sure about something | Lisa |

As these text messages indicate, Lincoln knew to be cautious about the conspiracy and conceal it from others. She was careful about how she explained the "gifts" to her family, and hid the illicit income from them. And she made sure not to discuss it within earshot of a coworker—as she noted on May 30, 2020, she could not talk on the phone with Lisa while she was carpooling with "another CO" (or corrections officer).

Lincoln did successfully conceal the extended scheme from her coworkers and her family, for nearly a year. But in June 2020, her secret was revealed when the FBI arrived at her house with a search warrant. There, they found the burner cell phone that Inmate 1

7

had given her for the specific purpose of coordinating their smuggling efforts. FBI forensic analysis found that the phone contained very limited data, but it did show one exchange from June 2020 between Lincoln and Inmate 1. On June 2 and June 4, 2020, Inmate 1 sent Lincoln media files (the files themselves could not be recovered from the phone). Then on June 7, 2020, he texted her, "Baby you worry to much everything will work out perfect. We just have to be smart and patient." No response from Lincoln was recovered.[2] The FBI also found Lincoln's personal phone during the search of her house in June 2020. But the FBI forensics team recovered no text messages that were sent or received after January 2019. (As noted in the Factual Basis of the plea agreement, Lincoln joined the conspiracy with Inmate 1 as early as July 2019. ECF 3, at p.5.)

### B. Lincoln's Statements to the FBI

Agents interviewed Lincoln on June 16, 2020, the morning they searched her house. Although she acknowledged that she maintained close relationships with several Goose Creek inmates, she claimed that was because of her desire to help people. After some targeted questioning, she admitted that she used a designated cell phone—which Inmate 1 had provided to her—specifically so that they could talk while she was at home. She initially denied ever taking anything inside Goose Creek other than food, and said she had not brought contraband to the facility in general or anything to Inmate 1.

When asked about T.W., Lincoln concocted a fake story. She denied any connection between T.W. and Inmate 1. She said T.W. was "one of my friends" and claimed they met

---

[2] A contraband cell phone was recovered from Inmate 1's cell at Goose Creek in late June 2020, but as of this date its data has not been evaluated.

over Facebook and they struck up a relationship. She claimed they arranged for T.W. to buy some of Lincoln's old things, like video games and an old meat grinder, for what Lincoln acknowledged were "trumped up" prices above the true value the items. She provided a series of shifting explanations, and only after being confronted with Western Union and MoneyGram records did she eventually admit that T.W. had sent her at least $3,900 in payments.

During this interview, Lincoln never expressed concern for her safety or her family's safety. She did not indicate that Inmate 1, or anyone else at Goose Creek, might have exerted pressure over her, and she did not seek any help protecting herself or her family.

This interview apparently did not sit right with Lincoln, and the next day, June 17, 2020, she contacted the FBI, telling the agents she wanted to meet again so she could tell them the whole truth. In a second interview on June 17, Lincoln admitted that she had lied when she spoke with the agents on the 16th. She claimed that the reason she had lied was due to fears for her safety and the safety of her family. She acknowledged that she had indeed brought contraband to Inmate 1, including a contraband cell phone and Suboxone strips.

In this second interview, Lincoln tacitly acknowledged the seriousness of her offense when she told the FBI that she never opened the packages the Suboxone was concealed in, because, as she told the agents,

> I won't touch that stuff I don't know anything about it, I don't know if I would get high off it or you know if I would overdose off of it, I don't want get that on me.

9

She added that she was willing to bring it into the facility only because it was in a container.

Lincoln also admitted that she knew T.W. was Inmate 1's sister. At first, she said that T.W. was sending her money so that she could "hold" it for Inmate 1, when he was released from prison. Only later in this second interview did she revise that statement, eventually admitting that the cash was paid in return for her smuggling, and for her own personal gain.

Lincoln began to take responsibility for her crimes after these initial meetings. After consulting with counsel, she quickly indicated her intent to plead guilty, even before any charges were filed. She has expressed remorse for her actions and an understanding of the serious nature of the crimes. She quickly left her job in what may be an effort to atone for her breach of trust. She also made full and prompt repayment of the money she received in bribe payments, which she delivered to the United States at the time she pled guilty.

C. **Recent Allegations at DOC**

In June 2022, shortly before this case was scheduled for sentencing, the Alaska Department of Corrections security staff learned from an inmate at Goose Creek that another inmate at the facility told him that a third inmate had been "given orders" to assault Lincoln's family member who also worked at Goose Creek, based on the connection to this case. DOC investigated the claim by talking directly with the source of the allegation (a third-hand witness), and reviewing phone records and recorded calls of the alleged would-be perpetrator of the assault and other associated inmates.

DOC's investigation has not revealed any additional information, nor has it uncovered any facts that could corroborate the initial third-hand allegation. According to

a memo from the Superintendent to the DOC Director of Institutions, compiled on June 8, 2022, the agency has been "unable to determine the strength or validity of the threat against [Lincoln's family member]." But because the members of the group involved are known to be volatile, DOC recommended taking action in "an abundance of caution." Lincoln's family member was moved to a different work station. And the inmate alleged to have received the "order" to make the assault was relocated to a different DOC facility located hundreds of miles away from Goose Creek.

Lincoln herself has received no known threats by any known co-conspirator or their associates, nor has any direct threat been communicated to her family member.

## GUIDELINES CALCULATION

As set forth in the plea agreement and as independently calculated by the Probation Officer, the U.S. Sentencing Guidelines are calculated as follows:

Base Offense Level [§2C1.1(a)(1)] …………………………………… 14

Specific Offense Characteristics: more than one bribe [§2C1.1(b)(1)] …. +2

Specific Offense Characteristics: value of payment
[§2C1.1(b)(2) and §2B1.1(b)(1)(C)] ……………………………………... +4

Acceptance of Responsibility1 [§3E1.1] …………………………….. -3

The total offense level is 17. The Presentence Investigation Report ("PSR") indicates that Lincoln has no criminal record, zero criminal history points, and is in Criminal History Category I. Accordingly, the advisory U.S. Sentencing Guidelines range is 24 to 30 months in custody.

# STATUTORY CRITERIA AND RECOMMENDED SENTENCE

In this case, the United States respectfully submits that the Guidelines produce a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing. Based on the nature and circumstances of the offense and the characteristics of the defendant, a sentence of 24 months in custody, the low end of the advisory Guidelines range, is appropriate. 18 U.S.C. § 3553(a).

### A.  The Nature and Circumstances of the Offense, 18 U.S.C. § 3553(a)(1)

Lincoln abused her position of trust and authority for her own personal profit. But worse than that, she put the safety of a vulnerable population in jeopardy by exposing them to illegal narcotic opioids—all the more harmful when many prisoners are struggling with addiction and sobriety—and providing wrongdoers like Inmate 1 with additional power, sway, and access to co-conspirators outside the prison walls by bringing him a contraband cell phone. No reliable information is available as to the amount of drugs that Lincoln provided to Inmate 1, but it is clear that the smuggling went on for nearly a year. The narcotics Lincoln smuggled were addictive opioids that are popular among prison inmates due to their small size and potential for abuse. That said, there is no evidence that any harm came to other corrections officers as a result of prisoners acting under the influence.

In addition, Lincoln obfuscated her involvement in the offense and has continued to claim—even as recently as her statement to the Probation Officer, through counsel—that she was threatened or intimidated into participating in the conspiracy. This claim is inconsistent with the evidence. In short, the facts of this case, including Lincoln's interviews with the FBI, do not add up to a plausible story that she participated in the

conspiracy out of fear, pressure, or coercion. Instead, it seems that her first impulse was to deny involvement, and only after coming to terms with the vast amount of evidence in the FBI's possession did she pivot, realizing that even her denials were incriminating. No doubt, Lincoln felt remorse and even fear after learning that she and her co-conspirators had been caught; certainly, the specter of reprisal from other participants might be haunting to anyone involved in a conspiracy with known dangerous criminals. But even if her fear is present *now*, after the investigation became known, there is no evidence that it was a motivating factor in her agreeing to Inmate 1's request.

Nor should this fear provide Lincoln with immunity from consequences. Prison guards who conspire with known criminals cannot avoid repercussions by claiming, after their crimes are exposed, to fear reprisal from those same co-conspirators. If so, no prison guard could be sentenced to prison for his or her criminal acts. Corruption would be impossible to deter through criminal prosecutions. Moreover, in this case, there are clear protections built in. Lincoln will serve any term of imprisonment in the custody of the federal Bureau of Prisons—not in an Alaska DOC facility where her co-conspirators and their associates reside. BOP routinely faces complicated situations involving inmate safety. It is a part of their mission to keep their inmates safe from harm, including from threats involving inmates housed together at the same facility. When Lincoln reports to serve a term in custody for this offense, she will be far from Alaska and far removed from any co-conspirators who might wish her harm.

### B. The Defendant's History and Characteristics, 18 U.S.C. § 3553(a)(1)

By all accounts, Lincoln has led a wholesome, productive, and law-abiding life with the exception of this offense. She has a loving and supportive family, a long work history, and an empathic nature. Once she turned the corner to take responsibility for this offense—which happened quickly if not immediately—she wholeheartedly expressed her remorse and contrition, and has noted her willingness to accept the consequences of her actions. One indication of this is her speedy action to forfeit the proceeds of the offense and return every penny to the government. Her acceptance of responsibility has been admirable. And her primary concern has been regret over the impact of her actions on innocent family members.

### C. The Need to Promote Respect for the Law and Provide Just Punishment, 18 U.S.C. § 3553(a)(2)(A)

A significant custodial sentence is necessary to reflect the seriousness of this public corruption offense. Lincoln was entrusted with a great deal of responsibility to ensure the care, custody, and supervision of inmates, and to honor her office. But for her own self-interested aims, Lincoln willingly exposed the inmates and staff at Goose Creek to the very dangers she was entrusted to safeguard against.

A meaningful term of incarceration is required to promote respect for our anti-corruption laws and to restore faith in our law enforcement agencies. "When a corrupt office holder receives too lenient a sentence, the public understandably loses confidence in the integrity of its system of government." *United States v. Sorenson*, 233 F. Supp. 3d 690, 699 (S.D. Iowa), aff'd, 705 F. App'x 481 (8th Cir. 2017) ("the community—historically

14
Case 3:21-cr-00094-TMB-MMS   Document 32   Filed 07/27/22   Page 14 of 20

and presently—requires that real, tangible, and severe consequences meet those who gain a position of public trust and then abuse that trust for personal gain"); *see also United States v. Anderson*, 517 F.3d 953, 966–67 (7th Cir. 2008) (affirming sentence where the district court stressed the corrosive effect that corruption has on the public trust and expressed his belief that the "scandals will not end unless they are treated 'appropriately hard'").

### D. The Need to Afford Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)

Lincoln's sentence must send a message of general deterrence: corruption in law enforcement will not be tolerated. Courts have recognized that "[d]eterrence is a crucial factor in sentencing decisions for economic and public corruption crimes." *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015); *see also, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (describing "economic and fraud-based crimes" as "more rational, cool, and calculated than sudden crimes of passion or opportunity" and, therefore, as "prime candidates for general deterrence" (cleaned up)). The sentence must make clear that those who abuse their positions of trust will face serious consequences. "[O]ne of the primary objectives of sentencing [public] officials convicted of bribery is to send a message to other public officials that bribery is a serious crime that carries with it a correspondingly serious punishment." *Morgan*, 635 F. App'x at 450–51 (alterations and internal quotation marks omitted); *see also United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill) (highlighting the need "to impose strict penalties on all defendants who engage in [public corruption]"), *aff'd* 447 F.3d 517 (7th Cir. 2006).

The need for general deterrence is particularly important in cases such as this one, which erode public confidence in our institutions and are notoriously difficult for law

enforcement to detect. *See, e.g., Sorenson*, 233 F. Supp. 3d at 699 ("Sentencing corrupt office holders to a colloquial 'slap on the wrist' may over time exacerbate an endemic cycle of corruption."); *Spano*, 411 F. Supp. 2d at 940 (explaining that crimes committed by public officials "undermine[] the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all").

The sentence in this case should send a message—particularly to those inmates and prison officials in the Alaska DOC community aware of correctional officers like Lincoln smuggling drugs into the prison—that the job of a corrections officer is one that requires integrity and fidelity to the oath one takes; it is not a job to be sought or accepted with the expectation that it can be used for illicit financial gain.

A sufficiently severe sentence also serves to protect the public from further harm. Though there is no individual victim in this case, it is important to acknowledge that, in the broader sense, there are many victims in this case. As the Eleventh Circuit has observed:

> Bribery cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government. … [B]ribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently. And that harm, though it may at times appear intangible, is real.

*United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014) (citations and internal quotation marks omitted)). Indeed, "[w]hen a person bribes [correctional officers] to do some act in contravention of their duties, that person is paying the officers to violate not only the law, but also the public trust placed in them," thereby "undermin[ing] the integrity and effectiveness of our criminal justice system." *United States v. Dodd*, 770 F.3d 306,

16

312 (4th Cir. 2014); *see also Sorenson*, 233 F. Supp. 3d at 700 ("The deviant acts of the corrupt public official are of course horrific, 'but a hundred times worse is the demoralization of our people which results.'" (quoting Justice Louis Brandeis, *Speech to the Good Government Association* (1903))); *Spano*, 411 F. Supp. 2d at 940 ("Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants."). Here, the combination of corruption by bribery with the smuggling of illegal drugs and cell phones demands a significant sentence to help restore the public's faith in Alaska's criminal justice system.

This particular defendant, on the other hand, is unlikely to commit further crimes, and has genuinely expressed regret and remorse; in addition, she no longer works in the correctional facility and is not in a position of access to commit any similar crimes. 18 U.S.C. § 3553(a)(2)(C). She is also not in need of the kind of training, medical care, or other treatment that a custodial sentence would provide. 18 U.S.C. § 3553(a)(2)(D).

**E.     The Need to Avoid Unwarranted Disparities, 18 U.S.C. § 3553(a)(6)**

Public corruption is a serious offense that is rightfully treated as among the most insidious crimes because of its impact on the functioning of society. Correctional officers who conspire with inmates for their own personal gain must be treated consistently, and Lincoln's case should be treated like others similarly situated. Some recent similar cases include the following:

- *United States v. Anibal Navarro*, S.D. Cal. Case No. 16-cr-1664. On January 13, 2022, correctional officer Navarro was sentenced to 37 months in custody following his guilty plea to federal program bribery under 18 U.S.C. § 666,

a conspiracy that involved smuggling narcotics and other contraband into a California state correctional facility in San Diego County.

- *United States v. Jeremy Chambers*, E.D.N.C. Case No. 21-cr-38. Chambers was a correctional officer at a North Carolina prison who pleaded guilty to accepting bribes from inmates in exchange for bringing them Suboxone strips, tobacco, and marijuana. Chambers' bribes totaled just $3,700. ECF 21, at 3. On October 1, 2021, he was sentenced to 24 months in custody, the low end of the applicable Guidelines range. *Id.* at 4; ECF 25; transcript of sentencing hearing available at ECF 29.

- *United States v. Kenneth Farr*, E.D.N.C. Case No. 4:21-CR-9, ECF 31, 33. In a companion case to *Chambers*, another correctional officer was sentenced to 24 months in custody, the low end of the Guidelines range.

- *United States v. Ollie Rose*, E.D.N.C. Case No. 4:20-CR-96, ECF Nos. 52, 57. In March 2022, the same Eastern District of North Carolina judge sentenced Rose, who was a prison case manager at the time of his offenses, to a within-guidelines sentence of 47 months, followed by two years of supervised release, and ordered forfeiture in the amount of $42,000.

- *United States v. Warren Reed*, E.D.N.C. Case No. 4:21-cr-36. In another case arising from the same investigation, correctional officer Reed was sentenced to a low-end term of 24 months in custody on July 25, 2022. He had been paid a total of $2,620 in bribes.

- *United States v. Lenard Fleming*, D.D.C. Case No. 14-cr-217.

Fleming was a prison guard in the District of Columbia. He pleaded guilty to bribery, admitting that he used his position as a prison guard to smuggle contraband. Although he was paid merely $750 for his smuggling efforts, then-D.C. District Judge Ketanji Brown Jackson sentenced Fleming to 27 months in prison.

- *United States v. Darren Malry*, D.D.C. Case No. 14-cr-331. Like *Fleming* and like Lincoln, Malry pleaded guilty to bribery, using his position as a D.C. corrections officer to smuggle marijuana, cell phones, food, and alcohol to an inmate. Malry also was paid a mere $750. He was sentenced to 27 months in prison.

Like Lincoln, each of these defendants pleaded guilty and accepted responsibility for his or her crimes. These defendants also had mitigating circumstances: they served their communities; they had strong family support—and they argued for lower sentences because of these factors. As these cases help demonstrate, a 24-month sentence for Lincoln—who earned vastly greater profits in bribes than these defendants—is in line with, if not lower than her similarly situated counterparts. Any sentence outside of the Guidelines range here would result in significant and unwarranted disparities in the outcomes of these very similar cases.

Moreover, Lincoln's sentence must be determined in light of the 24-month custodial sentence already imposed on her co-conspirator and co-defendant in a related case. *United States v. Lensegrav*, et al., 22-cr-1 (RRB), ECF 35. Lensegrav was an inmate who worked with Inmate 1 to collect and distribute profits from the narcotics distribution scheme that Lincoln made possible. Lincoln, as the sole public official involved and the only co-conspirator with access to both the inside and the outside as a result of her position of trust,

was the top of the pyramid in this trial. She should be sentenced to no less than his term of imprisonment, to ensure that no unwarranted sentencing disparities result in related cases brought as part of this investigation.

In short, a sentence within the Sentencing Guidelines range is the most effective way to ensure the consistency that is critical to avoiding unwarranted sentencing disparities and continue to serve the important goal of deterring others from engaging in similar crimes.

## CONCLUSION

A 24-month sentence with three years of supervised release is sufficient but not greater than necessary to fulfill the sentencing goals in this case.

RESPECTFULLY SUBMITTED on July 27, 2022 at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

/s Emily Allen
EMILY W. ALLEN
Assistant United States Attorney
United States of America

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2022
a true and correct copy of the foregoing
was served electronically on:

Jane Imholte

/s Emily Allen
Office of the U.S. Attorney